The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before then Deputy Commissioner Bernadine S. Ballance, and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award.
All objections raised during deposition testimony are ruled upon in accordance with the law and this Opinion and Award.
* * * * * * * * * *
RULINGS ON EVIDENTIARY MATTERS
1. Plaintiff's Exhibit No. 2, the National Electrical Code is NOT ADMITTED.
2. Plaintiff's Exhibit No. 3, Mark Walters Report is ADMITTED.
* * * * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through a Pre-Trial Agreement submitted after the hearing on 26 July 1994 as:
STIPULATIONS
1. On 3 September 1992, at the time of the alleged injury and alleged death by accident, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer up through and including the onset date of plaintiff's alleged injury and death. Liberty Mutual Insurance Company was the carrier on the risk at the time of plaintiff's alleged injury and death.
3. Plaintiff's average weekly wage at the time of the alleged injury was $423.07, which would yield a compensation rate of $281.76 on 3 September 1992, if the case is compensable.
4. Plaintiff began working for defendant-employer on or about 2 January 1986.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. On 3 September 1992, Douglas Westbrooks, age 35, was employed by Ronnie Bowes, doing business as Ronnie's Appliance in Roxboro, North Carolina. Douglas Westbrooks' job duties involved the delivery, installation and service of various home appliances such as refrigerators, stoves, dishwashers, range hoods, dryers, washing machines and ice makers. On said date Douglas Westbrooks drove to the home of Thomas and Renee Little in Person County with his assistant, Steven Thomas Whitt, to install an ice maker at the Little residence. When they arrived, they discovered that they would have to go under the house and cut off a water valve in the crawl space in order to install the ice maker. It was decided that Douglas Westbrooks would go under the house to cut the water valve off. The electrical power was not turned off before Douglas Westbrooks went under the house. The only other person, besides Steve Whitt, present at the home at said time was the son of Thomas and Renee Little, Steven Cheek.
2. Prior to going under the house to cut off the water valve, Douglas Westbrooks had not complained about any symptoms, conditions or physical problems to Steve Whitt or to his wife, Hattie Westbrooks or to his brother-in-law, Troy Wilson or to any other known person. Douglas Westbrooks' medical records did not reveal any prior history or diagnosis of coronary artery disease and further indicated that he enjoyed very good health.
3. It was a hot, humid day on 3 September 1992 at the home of Thomas and Renee Little. Douglas Westbrooks had been perspiring profusely and his clothes were wet with perspiration prior to going under the house that day.
4. The home of Thomas and Renee Little was a double-wide manufactured home with a crawl space under it. The crawl space got progressively lower in height from the crawl space door toward the direction of the water cut off valve. Douglas Westbrooks entered the crawl space of the mobile home through the crawl space door taking with him a 9-volt flashlight. Douglas Westbrooks called out to Steve Whitt telling him that he had cut the water off and then groaned twice and did not respond further. Douglas Westbrooks was dead at the time rescue workers arrived at the scene.
5. Brad Rhew of the Timberlake Fire and Rescue Squad was one of the rescue workers who arrived at the scene. Mr. Rhew talked to a person whom he could not identify who told him that he was afraid to go under the house. This was the same person who told him that he had called out to Douglas Westbrooks and received no response. Based upon the evidence, the person Mr. Rhew spoke with was Steve Whitt. The testimony of Steve Whitt at the hearing concerning what he did after Douglas Westbrooks became unresponsive differed from what he told Mr. Rhew.
6. Officer D. L. Phillips of the Person County Sheriff's Department went to the scene on 3 September 1992 and prepared a report based on notes he had taken of his conversation with Steve Whitt. The report prepared by D. L. Phillips states that the victim received an apparent electrical shock and also that evidence was found at the scene, although the report does not specifically note what evidence was found.
7. Several emergency medical personnel and rescue squad personnel testified at the hearing. Roy Brooks of the Timberlake Fire and Rescue Squad responded to the Little residence on said date and turned off the power before going under the house. Roy Brooks placed the response time at about six minutes from the time of the initial emergency call.
8. Allan Woody of Timberlake Fire and Rescue Squad testified that Douglas Westbrooks' body was found between a cinder block support pillar and the wall of the double-wide mobile home. Douglas Westbrooks' body was caught in a wire as they tried to remove it from the crawl space of the house. The wire was tannish in color, but Roy Brooks did not know what kind of wire it was. Allan Woody remembered that Mr. Westbrooks' body was tangled in wire and that the rescue people had to go around on the other side of the pillar in the crawl space of the mobile home and not along the wall closest to the crawl space door to get to the body because of the debris and materials that were stored along the wall. Mr. Woody testified that the body became tangled in the wire after they had moved it about five or six feet and he also testified that he did not see any wiring or the water shut off valve since they did not pull the body out of the mobile home along the wall where the crawl space door was located.
9. Renee Little testified that she and her husband had an electrician named Rick Davis come out the evening of 3 September 1992 after the incident to look at the wiring in the crawl space of the house to determine whether Douglas Westbrooks had been electrocuted. Rick Davis testified that he went under the crawl space of Mr. and Mrs. Little's house with the electricity cut off. He further stated that he had a flashlight and checked the wire by running his hand down it feeling for imperfections, but that he did not turn it over and go over it inch-by-inch. He admitted that he would have been more careful checking the wire if the power had been on and that it was possible that he missed the damaged area later found by Mark Walters. Rick Davis testified at the hearing that after Mark Walters had located an abraded area of the cable, he later viewed that abraded area of the cable. He testified that the abraded part of the cable was located about 18 inches from the water shut off valve.
10. Mrs. Little testified that Rick Davis told her everything looked fine under the house and that there was no reason to worry but that she might want to tack the wires up to the floor joists so that they would be off the ground. Both Mr. and Mrs. Little also testified that Rick Davis did not tell them that there was a potentially dangerous situation and that she is absolutely certain that he did not tell her that there was a potentially dangerous situation. On the contrary, Mr. Davis testified that he told Mr. and Mrs. Little that they had a potentially dangerous situation with the electrical wires lying on the ground in the damp crawl space.
11. Renee Little testified that between 3 September 1992 when Rick Davis went into the crawl space and 3 October 1992 when Mark Walters went into the crawl space, to her knowledge no one else had been in the crawl space to disturb any of the evidence.
12. Several days after Douglas Westbrooks died, Troy Wilson and Gail Westbrooks contacted Renee and Thomas Little and got their permission to have Mark Walters, a licensed residential and commercial electrician come out to their residence to look more closely at the wiring in the crawl space of the house. Mark Walters went to the Little residence on 3 October 1992 and went into the crawl space of the house with sufficient lighting to carefully look at the wiring. He left the power on during his inspection. He started at the origin of the wire that went to the water softener and inspected it down the length of the wire, inch-by-inch, turning it over as he went. He found a damaged area in the outer sheath of the Romex cable near the water cutoff valve a few feet from where it came out of the house. The damage was a tear in the outer sheath of the Romex cable about a half inch long. He could not see if the black hot wire in the Romex cable was damaged so he took a knife and carefully cut away the white sheathing to expose the conductors so that he could determine if the insulation on the black hot wire was damaged. He discovered that the black outer insulation on the conductive hot wire was also scraped away. Mark Walters opined that he considered this wiring to be an electrical shock hazard. Mr. Walters also found the ground in the crawl space to be damp. Several weeks later he returned to the crawl space and took photographs of the abraded areas of the wire that he had found. The cable was produced at the hearing and examination of the cable showed that the black inner insulation was abraded by what appeared to be a rough surface and not a sharp instrument. Portions of the outer white sheathing on the Romex cable were also abraded and torn by something other than a sharp object.
13. Mr. Walters had a conversation with Rick Davis prior to the hearing in this case and Mr. Davis asked if he [Rick Davis] could have missed the bad place in the wire.
14. When Roger Smith of Metropolitan Laboratories examined the wire for the defendants, he found the wire in the same location and in the same condition as described by Mark Walters in his testimony. Roger Smith removed the wiring from the crawl space in June, 1994 and conducted tests on the wiring which revealed that it was an electrical shock hazard. In addition, Mr. Smith opined that the cable could have been damaged by masonry block or brick being dropped on it. Renee Little testified that prior to Douglas Westbrooks' death, they went under the house to remove bricks and masonry blocks left by the brick masons who underpinned the trailer. Moreover, Mr. Smith testified that the type of cable which he removed from the crawl space (NM) should not be used in excessively moist or damp environments and that NMC cable should be used in damp environments.
15. Dale Fortner of the Person County Medical Service and Robert Clay of the Person County Medical Service testified that after the emergency medical team removed Mr. Westbrooks from the crawl space of the mobile home, they found him to be in fine ventricular fibrillation. They attempted to resuscitate him and to defibrillate him without success. Douglas Westbrooks' body was taken to Chapel Hill, North Carolina where an Assistant State Medical examiner, Dr. Deborah Radisch, performed an autopsy.
16. Dr. Radisch is board certified in clinical, anatomical and forensic pathology. Dr. Radisch's autopsy report noted that the cause of death was most likely coronary artery disease and the immediate mechanism of death was cardiac arrhythmia. There are basically two mechanisms of death in coronary artery disease cases. The first being cardiac arrhythmia or an irregular heartbeat and the second being a heart attack or myocardial infarction. There was no evidence of any infarction in Douglas Westbrooks' autopsy examination. Dr. Radisch testified that there are different types of arrhythmias, including tachycardia, bradycardia, atrial fibrillation and ventricular fibrillation. In Dr. Radisch's opinion, death from ventricular fibrillation is not instantaneous and the person can maintain consciousness for perhaps thirty seconds after developing ventricular fibrillation. A person with ventricular fibrillation can crawl for a short distance or even walk for a few steps. After that point in time, unless there is proper equipment for cardioversion to get the person out of the improper rhythm, the person will die. Ventricular fibrillation is a condition where the heart sort of wiggles and there is a disruption of the flow of blood and oxygen to the brain. It can be caused by electric shock if the path of the current travels through the heart. A very small amount of electricity can cause a ventricular arrhythmia depending on environmental factors. It is easier for electricity to enter the body if the skin is wet or sweaty since its resistance is lowered markedly. Perspiration conducts electricity better than pure water since there are salts in the perspiration that act as excellent conductors of electricity.
17. Dr. Burton, Dr. Radisch and Dr. Butts all agreed that electrical current sufficient to cause an arrhythmia such as ventricular fibrillation may not cause any skin burns. Dr. Radisch opined that Douglas Westbrooks would only need to be in contact with an electrical source for a second or two in order to induce a cardiac arrhythmia.
18. Dr. Radisch considered the possibility of death caused by electrocution at the time of autopsy, but ruled it out because she was told that there was no evidence of an electrical danger present at the scene where death occurred. In her opinion, however, there were no findings in the autopsy report that would be inconsistent with death by an arrhythmia induced by electrical shock.
19. Dr. Radisch further testified that if she had known at the time of the autopsy that an electrical shock hazard was present within two feet of the water shut-off valve, given the dampness in the crawl space and the condition of Mr. Westbrooks' clothes and body, she would have certified the death as being death by electrocution. Dr. Radisch further opined that if she had been told that Mr. Westbrooks' body had been found in the area beyond the water cut off valve, she would have been even more likely to have certified Mr. Westbrooks' death as an electrocution. Brad Rhew, who actually pulled Mr. Westbrooks' body from the crawl space of the double wide mobile home, testified that the body was found beyond the water shut-off valve.
20. Dr. Radisch found that Douglas Westbrooks' coronary arteries were partially occluded to an eighty-five percent degree in two different places, but stated she could have erred ten percent one way or the other due to the fact that she only estimated the amount of blockage and did not calculate the blockage with certainty. A stenosis or blockage of seventy-five percent or greater is clinically significant while blockages less than seventy-five percent are not generally clinically significant. According to Dr. Burton, the blockage measured during autopsy is not indicative of the actual functional restriction in a person who is alive.
21. Dr. John Butts, the Chief Medical Examiner, reviewed Dr. Radisch's autopsy report and additional information, including Mark Walters' findings, but he took no part in the autopsy or the preparation of the autopsy report. Dr. Butts testified that his problem with certifying Mr. Westbrooks' death as a death by electrocution was that he had no facts at his disposal to indicate that Mr. Westbrooks had come in contact with an electrical hazard or electrical source at the time of his death. Both Dr. Radisch, in the letter she wrote to plaintiff's attorney, and Dr. Butts, in his review note, noted that at the time the autopsy was performed, they believed there was no electrical shock hazard present in the area where Douglas Westbrooks died. Dr. Butts agrees that household current can induce a cardiac arrhythmia sufficient to cause death. Both Dr. Butts and Dr. Radisch opined that because of Mr. Westbrooks' coronary artery disease, he would have been more likely to have died from a cardiac arrhythmia induced by electrical shock than a person with no pre-existing coronary artery disease. Dr. Butts also concurs that a ten percent difference in the degree of restriction in the coronary arteries could be significant.
22. Dr. Butts further opined that if it could be shown that there was an exposed energized source in the immediate proximity of Douglas Westbrooks at the time that he was shutting off the valve, there is certainly a "possibility" that Douglas Westbrooks died as a result of electrocution. After being informed that the water shut-off valve was within 18 to 24 inches of the defect in the electrical cable, Dr. Butts admitted that the probability that Douglas Westbrooks came in contact with some part of the wiring was a "reasonable possibility". Dr. Butts further agreed that in almost fifty percent (50%) of the low voltage electrical shock cases, there is no evidence of burning on the skin. Dr. Butts believed, however, that it was more probable that Mr. Westbrooks died from cardiac arrhythmia brought on by coronary artery disease. After reviewing the autopsy report and the report of Mark Walters and the photographs of the damaged wiring, Dr. Butts stated in his review note in this case that, "[T]here would be no appreciable risk of electrocution unless the integrity of the insulation around the actual conductor itself had been broken and there is no indication of this in the report." Upon being told that the integrity of the insulation around the actual conductor had been broken, Dr. Butts still opined that the more probable cause of death was coronary artery disease and that he had to have conclusive proof that Douglas Westbrooks actually came in contact with the hazardous electrical wire before he would change his opinion.
23. Dr. James Lawson Burton was retained by plaintiff in this case to examine the autopsy reports and the evidence and to formulate an opinion as to the cause of death of Douglas Westbrooks. Dr. Burton's deposition was taken on 11 October 1994 in Marietta, Georgia. Dr. Burton is the Chief Medical Examiner for Atlanta, covering six counties and a population of two million people. Dr. Burton has performed personally over ten thousand autopsies and he conducts anywhere from two or three dozen electrocution autopsies per year. Approximately half of the electrocutions are high voltage and half are low voltage, with half of the low voltage cases not involving skin burns. As a part of Dr. Burton's investigation into the death of Douglas Westbrooks, he reviewed the emergency room and encounter record from Person County Memorial Hospital in Roxboro, North Carolina dated 3 September 1992, the code blue record from the hospital, including the agonal rhythm strips and blood gas reports, medical records for Mr. Westbrooks between 1968 and 1985, a death certificate signed by Bobby Maynor, the Medical Examiner for Roxboro, North Carolina, the autopsy report of Dr. Radisch, the ambulance trip sheet and the blood alcohol report, the Person County Sheriff's Department report by Officer D.L. Phillips, Mark Walters' electrical report, the clothing worn by Douglas Westbrooks at the time of his death, photographs of Douglas Westbrooks and his wife and his son made prior to his death, some photographs that were made of the clothing that Douglas Westbrooks was wearing at the time of his death, photographs of the crawl space underneath the residence where Douglas Westbrooks was working at the time of his collapse, a report written by Dr. Carl Britt who was asked to review the case for Eugene C. Brooks, the deposition of Dr. Butts, an electrical report from Roger Smith of MET Laboratories who tested the Romex wire, and the actual Romex cable that was removed from the crawl space of the house.
24. Dr. Burton's opinion is that Douglas Westbrooks' death was due to electrocution. Dr. Burton testified that to render this opinion, it would not be necessary for Douglas Westbrooks to have been found in contact with the electrical shock hazard as required by Dr. Butts. With respect to the coronary artery lesions observed by Dr. Radisch during autopsy, Dr. Burton opined that people with the same type of lesions live full and normal lives. Dr. Burton also testified that since there was no ground fault circuit interrupter on the wire to the water softener, there was an even greater likelihood that Mr. Westbrooks died from electrocution.
25. Dr. Butts opined that plaintiff's death was most likely caused by his pre-existing coronary artery disease and that the mechanism of death was most likely cardiac arrhythmia. Dr. Burton opined that plaintiff's mechanism of death, which was cardiac arrhythmia, was most likely caused by electrocution. Dr. Radisch's opinion as to cause of death by her own admission was based upon incomplete information which if known, could have caused her to reach a different conclusion. No weight is accorded Dr. Radisch's opinion as to cause of death.
26. It is undisputed that plaintiff had pre-existing coronary artery disease that could have alone led to death by cardiac arrhythmia. It is also established by the evidence that plaintiff was working in an area where he was likely to have come into contact with an existing electrical shock hazard sufficient to produce the type of cardiac arrhythmia or ventricular fibrillation which ultimately led to his death by electrocution. In this case, the medical reason for death — cardiac arrhythmia — is known. The disagreement is over the proximate cause of death. The Full Commission gives greater weight to the testimony and opinion of Dr. Burton on the cause of death and finds based upon the greater weight of the evidence that plaintiff's death was due to cardiac arrhythmia caused by electrocution. Dr. Burton's expertise in making a determination as to cause of death in electrocution cases is superior to that of Dr. Butts. Also, Dr. Butts appears to require plaintiff to meet a standard of "actual certainty" before he would opine that decedent's death was caused by electrocution.
27. On 3 September 1992, plaintiff sustained a fatal injury by accident arising out of and in the course of employment with defendant-employer. Defendant-employer had actual notice of the circumstances surrounding plaintiff's death immediately after his death.
28. At the time of death, Douglas Westbrooks was married to Gail Westbrooks and they had one (1) child, Matthew Westbrooks, born on 8 June 1987. Gail Westbrooks and Matthew Westbrooks are the only persons wholly dependent on Douglas Westbrooks for support.
* * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 3 September 1992, plaintiff died as a result of an injury by accident arising out of and in the course of employment with defendant-employer. Plaintiff's death is compensable under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §97-38.
2. Defendants had actual notice of plaintiff's fatal accident immediately and N.C. Gen. Stat. § 97-22 is not a bar to recovery. Gail Westbrooks and Matthew Westbrooks, a minor child, were the only persons wholly dependent upon Douglas Westbrooks at the time of his compensable fatal injury and are therefore entitled to compensation at the rate of $281.76 per week for 400 weeks from the date of death and as thereafter provided by law. N.C. Gen. Stat. § 97-38; 97-39.
3. Defendants shall reimburse for plaintiff's burial expenses up to $2,000.00.
4. Plaintiff's claim is not barred for failure to abide by the thirty-day notice provision of N.C. Gen. Stat. § 97-22.
* * * * * * * * * * * * * * *
Based on the foregoing finding of fact and conclusions of law, the Full Commission affirms the holding of Commissioner Ballance and enters the following:
AWARD
1. Defendants shall pay or cause to be paid to Gail Westbrooks, wife and to Gail Westbrooks as natural guardian of Matthew Westbrooks, the minor child of decedent Douglas Westbrooks, compensation at the rate of $281.76 per week. Said amount shall be divided equally between the two. The compensation awarded herein to Gail Westbrooks as wife of decedent shall be paid from the date of death of decedent and continuing for 400 weeks. That share of the compensation due Matthew Westbrooks shall be paid from the date of death of decedent and continuing for 400 weeks and thereafter continuing until said minor child reaches the age of 18. Compensation benefits which have accrued through the filing of this Opinion and Award shall be paid in a lump sum, subject to attorney's fees hereinafter awarded. The remainder shall be paid weekly at the rate set forth above, subject to attorney's fees.
2. An attorney's fee of 25% of the amount awarded herein shall be deducted from the accrued amount due Gail Westbrooks and Matthew Westbrooks and paid directly to plaintiff's counsel, Zeyland McKinney and Timothy Rasmussen according to terms agreed upon by them. Thereafter, plaintiff's counsel shall receive every fourth check due Gail Westbrooks and Matthew Westbrooks.
3. Defendants shall pay the burial expenses of decedent up to $2,000.00 to Gail Westbrooks, or to the parties to whom the bills are owed.
4. Defendants shall pay the medical expenses incurred by decedent's estate as a result of decedent's compensable injury and death when bills for same have been submitted to defendant and approved through procedures adopted by the Industrial Commission.
5. Defendants shall pay the costs.
 S/ _____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________ COY M. VANCE COMMISSIONER
DISSENTING:
S/ _______________ DIANNE C. SELLERS COMMISSIONER